**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------- x
RASPBERRY JUNCTION PROPERTIES,   :
LLC, and JULIA TATE PROPERTIES,  :
LLC,                             :
                                 :
          Plaintiffs,            :
                                 :
v.                               :   Civil No. 3:18-cv-1243 (AWT)
                                 :
EDWARDS FAMILY PARTNERSHIP, LP,  :
and CHARLES C. EDWARDS, M.D.,    :
                                 :
          Defendants.            :
-------------------------------- x
```

<u>**MEMORANDUM OPINION**</u>

The plaintiffs, Raspberry Junction Properties, LLC, a Connecticut limited liability company ("Raspberry Junction"), and Julia Tate Properties, LLC, a Connecticut limited liability company ("Julia Tate"), proceeded to trial on an eight-count Second Amended Complaint against defendant Edwards Family Partnership, LP, a Delaware limited partnership with a principal place of business in Maryland ("EFP"), and Charles C. Edwards, M.D. ("Edwards"), a Maryland resident who is the general partner of EFP.

The First Count and the Second Count are claims for breach of contract by the plaintiffs against EFP. The Third Count is a claim for bad faith breach of contract by the plaintiffs against EFP. The Fourth Count is a claim for breach of the implied covenant of good faith and fair dealing by the plaintiffs

against EFP. The Fifth Count is a promissory estoppel claim by the plaintiffs against EFP and Edwards. The Sixth Count is a claim for fraudulent misrepresentation by the plaintiffs against EFP and Edwards. The Seventh Count is a claim for negligent misrepresentation by the plaintiffs against EFP and Edwards. The Eighth Count is a claim for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a – 42-110q ("CUTPA"), by the plaintiffs against EFP and Edwards.

For the reasons set forth below, after a bench trial, the court finds for the plaintiffs on all but one of the claims in the Second Amended Complaint.

## I.   FINDINGS OF FACT

Plaintiff Raspberry Junction owns Raspberry Junction Holding, LLC, a Delaware limited liability company ("Raspberry Holding"). Raspberry Holding owns and operates the Bellissimo Grande Hotel in North Stonington, Connecticut. Plaintiff Julia Tate owns Julia Tate Holding, LLC, a Delaware limited liability company ("Julia Tate Holding"). Julia Tate Holding owns and operates the Hilton Garden Inn in Preston, Connecticut. Patrick Levantino is the owner and member of both of Raspberry Junction and Julia Tate. He and his companies own three hotels in Connecticut and decided to sell two of them, the Bellissimo Grande Hotel and the Hilton Garden Inn.

In addition to being an orthopedic physician, Edwards is an

experienced businessman and has fifty years of business experience. His experience includes but is not limited to ownership of an apartment building, the subdivision of land, lending money, and owning thirty-four condominiums in the Outer Banks.

The plaintiffs entered into a finder's fee agreement on January 11, 2018 with Frank Nocito in connection with their effort to sell the two hotels. Edwards was introduced to the plaintiffs by Nocito. Edwards was also looking at the potential purchase of the Marriott hotel in Stamford, Connecticut. Edwards acted on behalf of EFP in all his dealings with the plaintiffs and Levantino.

On January 24, 2018, EFP entered into a purchase and sale agreement (the "Purchase Agreement") under which EFP would purchase all of Raspberry Junction's interest in Raspberry Holding and all of Julia Tate's interest in Julia Tate Holding, giving EFP control and ownership over the Bellissimo Grande Hotel and the Hilton Garden Inn. Edwards signed the Purchase Agreement on behalf of EFP. The purchase price was $35 million, and pursuant to Section 7.1 of the Purchase Agreement, the closing was to occur no later than thirty days after expiration of the "Due Diligence Period." Pls.' Ex. 1, at 16. Due Diligence Period is defined in Section 5.3(a) of the Purchase Agreement as follows:

> Commencing on the Effective Date and continuing until One hundred Twenty **(120)** calendar days from the Effective Date (the "Due Diligence Period"), Purchaser shall have the right, upon reasonable notice to the Company as set forth below, at Purchaser's risk, cost and expense, to enter, or cause its representatives to enter, upon any Property for the purpose of making surveys, tests, inspections, investigations and/or studies of such Property as Purchaser may, in its sole discretion, deem desirable ("Inspections") . . . . In addition, during the Due Diligence Period, Purchaser shall have the right, upon reasonable notice to each of the Companies and during normal business hours, to have, or to permit its representatives to have, access to all books, records, Contracts, Licenses and Permits, the Operating Agreement with respect to each of the Companies and/or the Property and which is solely related to the operation or ownership of the Property.

Pls.' Ex. 1, at 13-14.

Section 2.5 of the Purchase Agreement required EFP to make a $100,000 initial deposit. It stated:

> Within three (3) Business Days after the Effective Date, Purchaser shall deliver a wire transfer of immediately available federal funds to the account designated by Escrow Agent for the transaction contemplated hereby in the amount of One Hundred Thousand Dollars ($100,000) (the "Initial Deposit"). The Deposit shall be returned to Purchaser if Purchaser, prior to the end of the Due Diligence Period, notifies Seller in writing that Purchaser is electing to terminate this Agreement. . . . The deposit shall be held and disbursed by Escrow Agent in strict accordance with the terms and provisions of this Agreement. Within ten days after the Effective Date, Purchaser shall deliver to Seller proof of funds equal to Fifteen Million ($15,000,000.00) Dollars.

Id. at 7. Section 5.3 of the Purchase Agreement gave EFP the right to terminate the Purchase Agreement in its sole discretion prior to the expiration of the Due Diligence Period, in which

case the $100,000 deposit would be returned to EFP. However, if EFP failed to deliver the notice of termination before the end of the Due Diligence Period, any deposits were nonrefundable. Section 5.3(c) reads as follows:

> Prior to expiration of the Due Diligence Period, for any or no reason, Purchaser may give written notice to Seller and the Companies of Purchaser's desire not to proceed with the purchase of the Membership Interests, and upon delivery of such notice, this Agreement and each Party's obligations hereunder shall terminate (excepting, however, any obligations or liabilities that are specifically identified herein to survive a termination of this Agreement) and Seller and the Companies hereby irrevocably direct the Escrow Agent to, and the Escrow Agent shall, cause the Deposit and all interest accruing thereon to be promptly delivered to Purchaser. Seller and the Companies hereby waive any right or otherwise to prevent or object to the return of the Deposit and all interest accruing thereon if Purchaser timely terminates this Agreement pursuant to this Section 5.3(c). If the Purchaser does not deliver the Termination Notice to the Seller before the end of the Due Diligence Period, then the Deposits shall be considered non-refundable, subject to the terms of Article 6 below. If the Purchaser does not deliver the Termination Notice, then the Purchaser shall deposit an additional One Hundred Thousand ($100,00.00) Dollars with the Escrow Agent, which amounts shall also be considered non-refundable. If the Purchaser does not deliver the Termination Notice to the Seller, thereafter all Deposits tendered after the Due Diligence Period shall be released by the Escrow Agent directly to the Seller.

Id. at 14.

Section 15.4 governed notices and other communications required by the Purchase Agreement. Notices to the sellers were to be sent to Levantino with a copy to the sellers' attorney, Santa Mendoza. Notices were required to be "in writing and

delivered by hand against receipt or sent by recognized
overnight delivery service, by certified or registered mail,
postage prepaid, with return receipt request or by facsimile or
telecopy." Id. at 22.

While the Purchase Agreement provided that the escrow agent
could be "either Fidelity National Title Insurance Co.
. . . (or) the trust account of a licensed attorney selected by
the Purchaser," id. at 3, the initial draft of the Purchase
Agreement prepared by the attorney for the plaintiffs, Santa
Mendoza, and sent to Edwards on January 10, 2018, provided that
the escrow agent would be Attorney Mendoza.

Section 15.11 of the Purchase Agreement included a
confidentiality provision. In the event the Purchase Agreement
was terminated, each party was required to return all documents
it had obtained under the Purchase Agreement from any other
party (unless readily available from public information sources)
and the confidentiality provision would survive the termination.
There is also a non-competition provision pursuant to which the
EFP agreed that, in the event the Purchase Agreement was
terminated, it would not build another hotel within twenty miles
of the Bellissimo Grande Hotel and the Hilton Garden Inn; there
was a reciprocal agreement not to compete by the sellers. The
Purchase Agreement is governed by Connecticut law.

On about January 31, 2018, EFP retained attorney William

Rock, a partner at the law firm of Shipman & Goodwin, to represent it in connection with the transaction contemplated by the Purchase Agreement. Attorney Rock was also retained to serve as the escrow agent and signed the Purchase Agreement in that capacity. Edwards informed the plaintiffs that Attorney Rock had been retained to serve as the escrow agent.

On January 30, 2018, Edwards sent Levantino his "due diligence 'opening round' list of questions & requests." Pls.' Ex. 10. Levantino responded the next day, January 31, at 12:47 p.m. asking whether the $100,000 had been put into the escrow account. Edwards responded at 1:02 p.m. that he had selected Attorney Rock as the escrow agent and had asked him for wiring instructions for his law firm's trust account. Edwards advised Levantino that he would wire the funds when he received the wiring instructions. However, it was not until 1:56 p.m. that day that Edwards initiated an email exchange with Attorney Rock where the topic of wiring instructions came up, and at 2:40 p.m., Rock indicated that he would have the trust account information sent to Edwards. At 2:50 p.m., a paralegal working with Attorney Rock sent Edwards the wiring instructions for the trust account.

On the same day, at 3:31 p.m., Edwards wrote to Levantino that "[t]he deposit was wired to the Shipman & Goodwin real estate trust account from EFP's BOA account this afternoon."

Pls.' Ex. 11. But no wire was ever sent to Shipman & Goodwin. At 3:43 p.m., Edwards informed the Shipman & Goodwin paralegal that he had requested the wire from Bank of America and at 3:45 p.m., the paralegal responded that she would confirm receipt of the wire with Edwards by email. Edwards never received any confirmation of receipt of the funds by Shipman & Goodwin that day or at any other time. Thus, Edwards knew, on the day that he made it, that his statement to Levantino at 3:31 p.m. on January 31 that the funds had been wired was untrue.

The defendants assert that Edwards contacted Bank of America/Merrill Lynch on January 31 and directed that the $100,000 be wired to Shipman & Goodwin's trust account. There is no credible evidence that any such instruction was ever given by Edwards. Edwards testified during his deposition that he had sent Cassandra Campbell, Edwards's contact at Bank of America/Merrill Lynch, wire instructions on over 100 occasions during the preceding four or five years. He testified that his practice was to call her and then scan and email the wire instructions. He testified he always did this and that he followed that procedure on this occasion. However, there is no record of any such email. Campbell testified about the procedure that is followed when a customer calls to initiate a wire transfer. Campbell would enter the wire request into the system, and the wire instructions would be validated. Campbell would

then submit the request by clicking on the submit button. If these steps are followed, there is a record in the system that the wire request was submitted. There is nothing in Bank of America/Merrill Lynch's records reflecting that any such wire request was submitted. Campbell had at that time been employed at Bank of America/Merrill Lynch for more than fourteen years, and on no prior occasion had she ever neglected to hit the submit button after entering a request for a wire transfer. Campbell also testified that she had a practice when dealing with wires of looking for a confirmation in the system that the wire had in fact gone through; she would get a service request number which would confirm that she had submitted the request. Campbell never looked for a confirmation. Moreover, Campbell testified that she had a practice of confirming with the recipient that the wire went through. There is no evidence of any attempt by Campbell to confirm receipt of a wire with anyone at Shipman & Goodwin.

Telephone records show that there was a call between Edwards and Bank of America/Merrill Lynch that began at 3:30 p.m. (in other words, after the email to Levantino saying that the funds had been wired) and lasted for seven minutes. During her testimony at trial, Campbell was reluctant to contradict Edwards, who is one of her boss's important clients, but it is clear that she has no independent recollection of this call and

that she had no reason to believe that she had neglected to
enter a wire transfer request into the system until Edwards
called her to suggest that this had happened.

On February 1, 2, and 3, a representative of the plaintiffs
sent confidential and proprietary documents and other
information to Edwards in response to his due diligence request.
They sent confidential financial information, including a
password to access tax returns. Other documents that were sent
also required a password for access, and Edwards was furnished
with the password when he requested it. On February 5, Edwards
wrote to the plaintiffs thanking them for "the prompt and
complete answers to our first information request." Pls.' Ex.
19. He attached a second round of questions and requests, to
which the plaintiffs responded.

On February 6, 2018, Attorney Rock wrote to Edwards stating
"I have signed the PSA as escrow agent, but we have not received
a wire of the deposit. Please advise." Pls.' Ex. 81. Edwards
responded the next day, stating that he had contacted Bank of
America, but Edwards never made any attempt to send the wire. He
instructed Rock to hold off on doing any legal work. He further
stated: "[u]nless you advise to the contrary, I will ask the
bank to hold the deposit while we sort this out. Unless I learn
something to counteract the shrinking market projections, I will
terminate the contract before our planned visit to the hotels

later this month." Id.

In the weeks that followed, Edwards failed to correct Levantino's mistaken assumption that the $100,000 deposit was being held in escrow on at least three occasions: on February 15, 2018 ("If seller keeping the escrow funds is acceptable then we should continue." (Pls.' Ex. 21)); February 24, 2018 (". . . I am seeking closure to your decision. . . . If you are out please let me know refund your money and allow me to maneuver in my own fashion." (Pls.' Ex. 25)); March 29, 2018 ("I am ready to refund the escrow if you choose and wish to terminate." (Pls.' Ex. 31)). The following month Edwards also made an affirmative statement conveying that the $100,000 deposit had been made. The parties originally planned to meet in February so Edwards and his children could see the properties, but that trip was postponed while the parties negotiated a number of business points and Edwards received additional information as part of the purchaser's due diligence. On April 5, 2018, Edwards sent Levantino a proposal for an amended agreement to convert the transaction to a sale of real estate. Among the "Key Business Terms for our 'New Deal'" was a statement that "$100k deposit transfers to seller at the end of inspection period unless buyer cancels." Pls.' Ex. 42.

During the month of April 2018, Edwards continued to conduct due diligence. On April 23, Levantino wrote to Edwards

concerning his proposal for an amended agreement. Levantino stated: "I read the attachment and it sounds for the most part as we discussed. I think the current agreement gets terminated and a new agreement will be executed needing my lawyer's approval." Pls.' Ex. 42. Edwards did not take issue with that statement by Levantino.

On April 23, Edwards and his daughter and son visited the properties. Edwards specifically requested that separate meetings between his son and daughter be set up with the following five people at each hotel: the general manager, the maintenance director, the chef, the front desk supervisor, and the housekeeping manager. Levantino arranged for those meetings. After the April 23 visit, the plaintiff sent additional due diligence materials to Edwards on inter alia May 24 and 25, 2018. At that point, the 120-day due diligence period had expired. The purchaser had never sent a notice of termination of any kind, much less one that complied with the requirement in Section 15.4 of the Purchase Agreement that notices be sent to Levantino with a copy to Attorney Mendoza.

On May 31, 2018, Attorney Mendoza sent a letter to Attorney Rock demanding proof that the additional deposit of $100,000 contemplated by Section 5.3(c) of the Purchase Agreement had been made and stating "[a]t this time both deposits are now to be paid directly to the Seller." Pls.' Ex. 60. Attorney Rock

forwarded the letter to Edwards, who sent an email to the

plaintiffs stating:

> I was just forwarded a letter to attorney Rock from
> Santa Mendoza. It states our original contract is
> "still in force". We both know that is not true. I
> withdrew from the original contract when I sent you
> the attached letter on Feb 15. It clearly stated that
> we would not be purchasing the companies under the
> terms of the original contract. There are numerous
> subsequent e-mails between us in which we discussed
> alternative terms for another deal. Indeed, Ms.
> Mendoza extensively edited a revised contract to
> purchase just the real estate. We have tried to find a
> deal that would work for both of us ever since and it
> is still evolving. When we met in Connecticut, you
> stated that you would be comfortable with no written
> contract once we ironed out new purchase terms. None
> of our conversations or correspond[e]nce suggested
> that the old contract is still in force. Please ask
> Ms. Mendoza to withdraw the letter.

Pls.' Ex. 60.

There is no basis for Edwards's assertion in his May 31,

2018 email that he withdrew from or terminated the original

contract. The February 15, 2018 letter to which he refers states

that "[m]y present state of mind is to stick with a $35 million

all-in cost for the hotels, but not acquire their present

capital gains liability. We would just purchase the real estate

and operating businesses as-is." Id.

On numerous other occasions after February 15, 2018,

Edwards either made statements which reflected an understanding

on his part that the Purchase Agreement remained in effect, or

else remained silent when Levantino made statements reflecting

the plaintiffs' understanding that the Purchase Agreement
remained in effect. Edwards made such statements on April 11,
2018 ("I am the contract buyer . . . ." (Pls.' Ex. 38)); April
17, 2018 ("I should . . . either try to complete the Amended
Agreement we are negotiating or terminate the existing
contract." (Pls.' Ex. 39)); May 3, 2018 ("The hotel acquisition
remains on track." (Pls.' Ex. 55)); May 12, 2018 ("My purchase
agreement with Patrick Levantino . . . ." (Pls.' Ex. 56)); and
May 23, 2018 ("I am the contract purchaser of the Preston Hilton
Garden Inn." (Pls.' Ex. 57)). Edwards remained silent in
response to statements by Levantino reflecting Levantino's
understanding that the Purchase Agreement remained in effect on
February 19, 2018 ("I understand you are deciding [whether] to
proceed or not based on the new conditions of your change to an
'asset sale' as opposed to our existing contract." Pls.' Ex.
23); February 25, 2018 ("I think this would have been a non
issue in our current agreement." (Pls.' Ex. 28)); March 29, 2018
("Otherwise our agreement stands. I am ready to refund the
escrow if you choose and wish to terminate." (Pls.' Ex. 31));
March 31, 2018 ( "Remember we only have one executed agreement
and these thoughts are just 'thoughts' and options assuming we
both agree to change the current terms." (Pls.' Ex. 32)); April
8, 2018 ("Remember under the current agreement . . . ." (Pls.'
Ex. 34)); April 11, 2018 ("Also what is the status on the new

contract? The call to Rialto is meaningless under the current agreement as you know. The current agreement does not require all of this." (Pls.' Ex. 36)); May 23, 2018 ("Our current agreement calls for a membership interest sell and not an asset sale." (Pls.' Ex. 58)); and May 30, 2018 ("I would certainly consider either creating a new contract or amending our current contract . . . ." (Pls.' Ex. 43)).

## II.  DISCUSSION

### A.  <u>First and Second Counts: Breach of Contract</u>

The First Count is a claim by the plaintiffs against EFP for failure to close in violation of Article 7 of the Purchase Agreement. Article 7 required that the closing be held within thirty days after the expiration of the Due Diligence Period, unless some other date was agreed to by the parties. The Second Count is a claim by the plaintiffs against EFP for breach of contract by failing to put the $100,000 in escrow as required by Section 2.5 of the Purchase Agreement. The plaintiffs seek payment of $100,000 in liquidated damages plus prejudgment interest.

The Purchase Agreement is governed by Connecticut law. "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." <u>Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.</u>, 311 Conn. 282, 291 (2014).

Notice of termination of a contract must be "sufficiently clear and unequivocal so as clearly to apprise the other party of the action being taken." Zullo v. Smith, 179 Conn. 596, 604 (1980). "Although it is generally accepted that contracting parties may reserve the right to terminate a contract for convenience or cause upon a specified period of notice . . . [i]f a party who has a power of termination by notice fails to give the notice in the form and at the time required by the agreement, it is ineffective as a termination[.]" Semac Electric Co., Inc. v. Skanska USA Bldg., Inc., 195 Conn.App. 695, 715 (2020) (internal quotation marks and citations omitted), cert. denied, 335 Conn. 944 (2020), cert. denied, 335 Conn. 945 (2020).

The Due Diligence Period expired on May 24, 2018, and EFP does not dispute that there was never a closing. Rather, EFP maintains that Edwards terminated the Purchase Agreement, pointing to language in a number of emails in which Edwards and Attorney Mendoza make statements which merely reflect that negotiations are ongoing. The defendants assert that this constitutes "actual, unequivocal notice of [Edwards's] desire not to proceed with the purchase of the Membership Interests." Def. Post-Trial Brief (ECF No. 92), at 6. But even considered in isolation, these communications do not convey such a message. Moreover, when considered in conjunction with the other

statements by Edwards and his failure to respond to statements by Levantino, these communications relied upon by EFP fall well short of constituting a clear and unequivocal message that Edwards wished to terminate the purchase agreement.

In addition, even if it were debatable as to whether Edwards conveyed by some means that he wished to terminate the Purchase Agreement, he did not comply with the requirements in the Purchase Agreement for giving such notice. While EFP argues that the form of such notice "should be immaterial as no prejudice can be shown," failure to comply with the notice requirements is material because the plaintiffs have shown prejudice in that they continued to provide Edwards with confidential and proprietary information as part of the due diligence process. Id.

EFP failed to put the $100,000 in escrow as required by Section 2.5 of the Purchase Agreement. This was a material breach of the Purchase Agreement as reflected by, inter alia, Levantino's insistence that the $100,000 deposit be made before the plaintiffs provided confidential and proprietary information to the defendants as part of the due diligence process. The defendants argue that the plaintiffs were not injured because the Purchase Agreement provided that if the Purchase Agreement was terminated prior to the end of the Due Diligence Period, the $100,000 was to be returned to EFP. However, as discussed above,

the plaintiffs have established that the Purchase Agreement was not terminated prior to the end of the Due Diligence Period.

The plaintiffs are entitled to judgment on the First and Second Counts in the amount of $100,000, plus prejudgment interest.

### B.  Third Count: Bad Faith Breach of Contract

The Third Count is a claim by the plaintiffs against EFP for bad faith breach of contract. The plaintiffs claim that EFP not only breached the Purchase Agreement but did so willfully, wantonly, and/or in reckless disregard of the plaintiffs' rights. The plaintiffs seek compensatory damages, prejudgment interest, and punitive damages.

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Franco v. Yale Univ., 238 F.Supp.2d 449, 455 (D. Conn. 2002) (quoting Habetz v. Condon, 224 Conn. 231, 237 (1992)). See also Feinberg v. Berglewicz, 32 Conn.App. 857, 861-62 (1993) ("Neglect or refusal to fulfill a contractual obligation can be bad faith only if prompted by an interested or sinister motive."). Bad faith is "not simply bad judgment or negligence, but . . . a state of mind affirmatively operating with furtive design or ill will."

<u>Buckman v. People's Exp., Inc.</u>, 205 Conn. 166, 171 (1987).

If wanton or malicious injury or reckless indifference to the interests of others gives a tortious overtone to a breach of contract action it justifies an award of punitive or exemplary damages. <u>See</u> <u>L.F. Pace & Sons, Inc. v. Travelers Indem. Co.</u>, 9 Conn.App. 30, 48-49 (1986) ("[S]uch recovery is limited to an amount which will serve to compensate the plaintiff to the extent of his expenses of litigation less taxable costs.").

The plaintiffs have proven with respect to the Second Count that the breach of contract was done willfully, wantonly, and in reckless disregard of the plaintiffs' rights. EFP knew that putting the $100,000 in the escrow account was material to the plaintiffs' decision to proceed with the due diligence process, in that the plaintiffs were not willing to divulge confidential and proprietary information concerning their businesses to him unless he made the $100,000 initial deposit. Edwards informed Levantino that the funds had been wired, even though he never instructed Bank of America/Merrill Lynch to wire the funds. Then he remained silent while Levantino made statements which made it clear that the plaintiffs believed that the $100,000 had been put in the escrow account. Even worse, as discussed above, Edwards made affirmative representations that the money was in the escrow account.

The plaintiffs are entitled to judgment on the Third Count

in the amount of $100,000 plus prejudgment interest and their
expenses of litigation, less taxable costs.

### C.  <u>Fourth Count: Breach of Implied Covenant of Good Faith and Fair Dealing</u>

The Fourth Count is a claim by the plaintiffs against EFP
for breach of the implied covenant of good faith and fair
dealing. The plaintiffs seek compensatory damages and
prejudgment interest.

"The common-law duty of good faith and fair dealing
implicit in every contract . . . is a rule of construction
designed to fulfill the reasonable expectations of the
contracting parties as they presumably intended." <u>Elm Street
Builders, Inc. v. Enterprise Park Condominium Ass'n, Inc.</u>, 63
Conn.App 657, 664-65 (2001). As stated by the Connecticut
Supreme Court:

> [I]t is axiomatic that the . . . duty of good faith
> and fair dealing is a covenant implied into a contract
> or a contractual relationship. . . . In other words,
> every contract carries an implied duty requiring that
> neither party do anything that will injure the right
> of the other to receive benefits of the agreement.
> . . . The covenant of good faith and fair dealing
> presupposes that the terms and purpose of the contract
> are agreed upon by the parties and that what is in
> dispute is a party's discretionary application or
> interpretation of a contract term. . . . To constitute
> a breach of the implied covenant of good faith and
> fair dealing, the acts by which a defendant allegedly
> impedes the plaintiff's right to receive benefits that
> he or she reasonably expected to receive under the
> contract must have been taken in bad faith. . . . Bad
> faith in general implies both actual or constructive
> fraud, or a design to mislead or deceive another, or a

>           neglect or refusal to fulfill some duty or some
>           contractual obligation, not prompted by an honest
>           mistake as to one's rights or duties, but by some
>           interested or sinister motive. . . . Bad faith means
>           more than mere negligence; it involves a dishonest
>           purpose.

De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn.
424, 432-33 (2004) (internal quotation marks, brackets, and
citations omitted).

The plaintiffs have established that EFP breached the
implied covenant of good faith and fair dealing. Edwards
informed the plaintiffs that the wire transfer with respect to
the $100,000 that was to be held in escrow had occurred when he
knew he had never given directions for it to be made. Edwards
never informed Levantino that he was mistaken when Levantino
made statements that clearly conveyed that Levantino believed
that the $100,000 was in the escrow account. Edwards continued
the pretext even when dealing with his own attorney in response
to Attorney Rock's February 6, 2018 email. He then asked the
plaintiffs to continue to provide the defendants with due
diligence materials, which included confidential and proprietary
information, when he had to have known that if the plaintiffs
knew that the $100,000 had not been put in the escrow account,
they would not have provided such information.

The plaintiffs are entitled to judgment on the Fourth Count
in the amount of $100,000, plus prejudgment interest.

D.   **Fifth Count: Promissory Estoppel**

The Fifth Count is a claim for promissory estoppel against EFP and Edwards. The plaintiffs claim that Edwards, acting on behalf of EFP, clearly and definitely represented that he would deposit $100,000 in escrow, pursuant to the Purchase Agreement.

In order to establish a claim of promissory estoppel, a plaintiff must demonstrate two essential elements: (1) "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief" and (2) "the other party must change its position in reliance on those facts, thereby incurring some injury." Dep't of Transp. V. White Oak Corp., 319 Conn. 582, 611 n.11 (2015) (citations omitted). "It is fundamental that a person who claims . . . estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." Id.

Here, the plaintiffs have not established by a preponderance of the evidence that they lacked any reasonable, available means of acquiring knowledge as to the true state of affairs with respect to the $100,000 initial deposit. Edwards sent an email to Levantino on January 31, 2018 stating that the deposit "was wired to the Shipman & Goodman real estate trust

-22-

account from EFP's BOA account this afternoon." Pls.' Ex. 11.
That statement is immediately followed by the following
statement: "For confirmation, the S&G paralegal who sent me the
wire instructions is pasted below." Id. Levantino responded: "I
do not feel the need to confirm with paralegal below... I trust
you and trust it[']s been done and thank you for the
confirmation." Id. Thus, Levantino had the opportunity to
contact the paralegal, which constituted "reasonably available
means of acquiring knowledge" that the deposit never happened.
Spear-Newman, Inc. v. Modern Floors Corp., 149 Conn. 88, 92
(1961).

　　　The defendants are entitled to judgment on the Fifth Count.

### E.　　Sixth Count: Fraudulent Misrepresentation

　　　The Sixth Count is a claim by the plaintiffs against EFP
and Edwards for fraudulent misrepresentation. The plaintiffs
claim that Edwards represented to them that the $100,000 deposit
had been wired to the escrow account on January 31, 2018, that
Edwards knew that it had not wired, and that Edwards did not
correct his misrepresentation until June 3, 2018 despite many
communications with the plaintiffs prior to that date. The
plaintiffs seek compensatory damages, prejudgment interest,
punitive damages, and attorney's fees.

　　　To prove a claim for fraudulent misrepresentation under
Connecticut law, a plaintiff must prove the following four

elements: "(1) a false representation was made as a statement of
fact; (2) it was untrue and known to be untrue by the party
making it; (3) it was made to induce the other party to act upon
it; and (4) the other party did so act upon the false
representation to his injury." Sturm v. Harb Development, LLC,
298 Conn. 124, 142 (2010). "In contrast to a negligent
representation, a fraudulent representation . . . is one that is
knowingly untrue, or made without belief in its truth, or
recklessly made and for the purpose of inducing action upon it."
Id.

    In addition:

        Fraud by nondisclosure expands on the first three of
        the four elements of fraud and involves the failure to
        make a full and fair disclosure of *known* facts
        connected with a matter about which a party has
        assumed to speak. . . . To constitute fraud by
        nondisclosure, there must be a failure to disclose
        known facts and, in addition thereto, a request or an
        occasion or a circumstance which imposes a duty to
        speak. . . . The duty to disclose known facts is
        imposed on a party insofar as he voluntarily makes
        disclosure. A party who assumes to speak must make a
        full and fair disclosure as to the matters about which
        he assumes to speak.

Statewide Grievance Committee v. Egbarin, 61 Conn.App. 445, 454-
55 (2001) (internal quotation marks, brackets, and citations
omitted).

    Edwards made false representations as a statement of fact
when he stated on January 31, 2018 that "[t]he deposit was wired
to the Shipman & Goodman real estate trust account . . . this

afternoon." Pls.' Ex. 11. He also did so when he stated in the attachment to his April 23, 2018 email, concerning proposed terms for a new agreement, that the "$100k deposit transfers to seller at the end of inspection period unless buyer cancels." Pls.' Ex. 42. Both statements were untrue and he knew them to be untrue, and assuming arguendo that he did not know them to be untrue, he made them recklessly. He also made the statements to induce the plaintiffs to act upon them, on January 31 to proceed with due diligence, and on April 23 to continue negotiations and due diligence. As explained above, the plaintiffs were injured because they relied upon these false representations by Edwards.

In addition, as discussed above, Edwards failed to correct Levantino each time Levantino made a statement making it clear that he believed that the $100,000 was in the escrow account. Edwards replied to Attorney Rock's February 6 email about the fact that there had been no wire transfer by stating that he would have Bank of America/Merrill Lynch hold the deposit. Edwards knowingly misled Levantino in correspondence with him when he withheld this fact from Levantino.

Thus, the plaintiffs are entitled to judgment on the Sixth Count in the amount of $100,000 plus prejudgment interest and their expenses of litigation, less taxable costs.

**F.   <u>Seventh Count: Negligent Misrepresentation</u>**

The Seventh Count is a claim by the plaintiffs against EFP and Edwards for negligent misrepresentation. The plaintiffs claim that, in violation of his duty of care in making material representations, Edwards engaged in no due diligence to ensure that the wire transfer had occurred and that he did not correct his misrepresentation despite knowing it was not true. The plaintiffs claim that they reasonably relied on Edwards's misrepresentation to their detriment. The plaintiffs seek compensatory damages, prejudgment interest, and punitive damages.

A claim for negligent misrepresentation under Connecticut law requires the plaintiff to prove the following four elements: "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." <u>Coppola Constr. Co., Inc. v. Hoffman Enters. Ltd. P'ship</u>, 309 Conn. 342, 351-52 (2013) (internal quotation marks and citations omitted).

"Liability for negligent misrepresentation may be placed on an individual when there has been 'a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak[.]'" <u>Johnnycake Mountain Assocs. v. Ochs</u>, 104 Conn.App. 194, 206 (2007).

For the reasons discussed with respect to the Sixth Count, the claim for fraudulent misrepresentation, the court concludes that the plaintiffs have also proven this claim. Thus, the plaintiffs are entitled to judgment on the Seventh Count in the amount of $100,000 plus prejudgment interest.

### G.    Eighth Count: Violation of CUTPA

The Eighth Count is a claim by the plaintiffs against EFP and Edwards for violation of CUTPA. The plaintiffs seek compensatory damages, prejudgment interest, punitive damages, attorney's fees, and costs. See Ulbrich v. Groth, 310 Conn. 375, 449, 461 (2013) (interpreting CUTPA as authorizing actual damages, attorney's fees, and punitive damages, including nontaxable costs).

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a). The Connecticut Supreme Court has stated:

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the "cigarette rule" by the federal trade commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businessmen).

<u>Cheshire Mortg. Serv., Inc. v. Montes</u>, 223 Conn. 80, 105-06 (1992) (internal citations and quotation marks omitted). "Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." <u>Web Press Servs. Corp. v. New London Motors, Inc.</u>, 203 Conn. 342, 355 (1987). "[T]he same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation." <u>Lester v. Resort Camplands Intern., Inc.</u>, 27 Conn.App. 59, 71 (1992). Most courts "have held that a party need not allege more than a single act of misconduct to bring an action under CUTPA." <u>Pollock v. Panjabi</u>, 47 Conn.Super. 179, 198 (2000); <u>see</u> <u>Tokenke Center, Inc. v. Mellon Mortg. Co.</u>, 2000 WL 194673, *2 (D.Conn. 2000) (same). In addition, "[a] misrepresentation can constitute an aggravating circumstance that would allow a simple breach of contract claim to be treated as a CUTPA violation; it would, in effect, be a deceptive act." <u>Greene v. Orsini</u>, 50 Conn.Supp. 312, 316 (2007).

Edwards's conduct with respect to the initial deposit was deceptive and unscrupulous in violation of CUTPA. At a time when Edwards was looking at a business opportunity with respect to the Marriott hotel in Stamford, he obtained confidential and proprietary documents and other information from the plaintiffs

about the Bellissimo Grande and the Hilton Garden Inn by means of fraudulent misrepresentations. He did so by means of a course of conduct that lasted from January 31, 2018 to May 25, 2018, whereby he repeatedly made affirmative statements that he had put the initial deposit in escrow and intentionally misled the plaintiffs by omitting to tell them that he had never wired the deposit to his attorney. As part of this course of conduct, Edwards had negotiated a change in the language of the Purchase Agreement so that he could appoint his own attorney to serve as the escrow agent in the place of Santa Mendoza, the plaintiffs' attorney. After his attorney signed the Purchase Agreement as the escrow agent, Edwards pretended to be surprised that the $100,000 had not been wired to the escrow account and instructed his attorney to do no work on the matter. He also told his attorney one thing--i.e., that he would "ask the bank to hold the deposit"--while telling the plaintiffs the opposite. Edwards's misrepresentations were unfair, unscrupulous, and caused substantial injury to the plaintiffs.

Thus, the plaintiffs are entitled to judgment on the Eighth Count in the form of $100,000 in compensatory damages, prejudgment interest, $100,000 and nontaxable costs as punitive damages, and attorney's fees.

### III. CONCLUSION

Accordingly, judgment on the First Count, Second Count, Third Count, Fourth Count, Sixth Count, Seventh Count, and Eighth Count shall be entered in favor of plaintiffs Raspberry Junction Properties, LLC, and Julia Tate Properties, LLC, against the defendants, Edwards Family Partnerships, LP, and Charles C. Edwards, M.D., in the total amount of $200,000 ($100,000 in compensatory damages and $100,000 in punitive damages), together with prejudgment interest from May 24, 2018 to the date of judgment, and attorney's fees and nontaxable costs. Within thirty days, the plaintiffs shall file (1) a calculation of prejudgment interest pursuant to Conn. Gen. Stat. § 37-3a(a) and (2) an application for attorney's fees and nontaxable costs. (Taxable costs shall be addressed pursuant to D. Conn. Civ. R. 54.)

It is so ordered.

Dated this 29th day of September 2021, at Hartford, Connecticut.

_____
/s/AWT
Alvin W. Thompson
United States District Judge
